UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  SEP 14 2010

P.M.
TIME A.M.

------------------------------------------------------- X
                               :

JERRY KONG and DANIELLE D'ALESSIO, :

               Plaintiffs,     :

       - against -             :

TRISTAR MORTGAGE CORP., et al.,     :

              Defendants.     :

                               :
------------------------------------------------------- X

**MEMORANDUM
DECISION AND ORDER**

10 Civ. 1382  (BMC)

**COGAN**, District Judge.

       This action arises from plaintiffs' 2007 purchase of a new single family home in Staten Island, New York.  Plaintiffs allege that defendants – real estate brokers, mortgage brokers, attorneys, and seller to that transaction – acted in concert to defraud them by hiding the true nature and costs associated with their purchase.

       Before the Court are motions to dismiss by [34] Rosemarie Ann DeRogatis, Esq. and Danielle Shamah, Esq., [33] John Rukab, and [31] Palermo Construction Corporation.  For the reasons stated below, plaintiffs' federal claims are dismissed and this Court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims, which are dismissed without prejudice.

**BACKGROUND**

       For purposes of this motion, all well-pleaded allegations in plaintiffs' complaint are accepted as true, and all reasonable inferences are drawn in their favor.  See Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 91 (2d Cir. 2010).

I.       **Underlying Real Estate Transaction**

In 2006, plaintiffs Jerry Kong ("Kong") and Danielle D'Alessio ("D'Alessio") were considering purchasing a single family home located at 1807 Carlton Avenue in Staten Island, New York ("Carlton Ave. Property"), which was being built by Palermo Construction Corp. ("Palermo Construction"). They met with Palermo Construction's listing agent, Lynn Ghorra, ("Ghorra") from Neuhaus Realty, Inc. ("Neuhaus Realty"), who informed them that the house was recently reduced from $979,000 to $859,000. Plaintiffs were interested in purchasing the house but indicated to Ghorra that they were unsure if they could afford it.

During this meeting, Ghorra offered to help plaintiffs sell their current home located at 507 Maguire Avenue in Staten Island ("Maguire Ave. Property"). She also referred them to John Rukab ("Rukab"), a mortgage broker with Tristar Mortgage Corp. ("Tristar"). Ghorra commented that she had worked with Rukab "numerous times" and that he was "an excellent mortgage broker." Ghorra also suggested that they retain her daughter, Danielle Shamah, Esq. ("Shamah"), as their real estate attorney.[1] Before leaving, Ghorra persuaded plaintiffs to make an offer on the house for the asking price, $859,000. She claimed that Palermo Construction had already reduced the price and there was no more room for negotiation. Plaintiffs signed a piece of paper and gave Ghorra $1.00 to "bind" the house.

The following week, plaintiffs met with Rukab and orally provided him with their financial information. They stated their monthly salaries, outstanding student loans, and noted that neither of them had more than $1,000 in their savings accounts. Rukab never requested any documentation from plaintiffs. Nor did he provide them with copies of any paperwork or the completed mortgage loan application, which plaintiffs later learned included several

---

[1] Shamah and her boss, Rosemarie Ann DeRogatis, Esq. ("DeRogatis"), represented plaintiffs in their purchase of the Carlton Ave. Property and sale of the Maguire Ave. Property.

misrepresentations, such as over-stating Kong's monthly income and assets. Rukab informed them that "it was not going to be easy," but that he thought he could make the purchase "happen" for them.

Palermo Construction accepted plaintiffs' offer of $859,000 to purchase the Carlton Ave. Property. Shortly before closing, Rukab contacted plaintiffs and told them that Palermo Construction needed a $25,000 down payment before it would sign the Contract for Sale. Since plaintiffs did not have enough money in savings, Rukab told them that the owner of Neuhaus Realty, Mimi Neuhaus, a/k/a Domenica Mimi Neuhaus ("Neuhaus"), was "nice enough" to agree to advance the $25,000 to Palermo Construction and that they could pay her back after the closing. Both Rukab and Ghorra assured plaintiffs that this was not unusual and that they did this all the time. Plaintiffs did not receive anything in writing regarding the $25,000 advance, nor did they discuss specific details of repayment, or receive proof that the money was actually paid to Palermo Construction.

When the Contract for Sale was executed in August 2006, it did not reference this $25,000 advance. Rather, it listed the purchase price as $884,000 with a seller's concession of $25,000, for a total of $859,000, and indicated that a $25,000 deposit was due to the seller upon signing. The contract also provided for plaintiffs to pay the seller's estimated $15,000 in transfer taxes. Plaintiffs contend that Shamah never discussed the specific terms of the contract with them.

In December 2006, Rukab again contacted plaintiffs and told them that they would need an additional $120,000 in order to buy the Carlton Ave. Property. Rukab noted that Neuhaus was once again willing to lend them the money. He again assured plaintiffs that they did this all the time to assist home owners with property purchases, and that they could refinance their house

3

as early as two months after the closing in order to pay her back.  Plaintiffs agreed and on December 22, $120,000 was transferred from Neuhaus's account to Kong's bank account. Neither Rukab nor Shamah explained what these additional funds were for or why they were necessary.

Plaintiffs closed on the Carlton Ave. Property on February 6, 2007.  At closing, plaintiffs were presented for the first time with the interest rate and terms of their mortgage, which included a first Mortgage for $650,000 and a second Mortgage for $160,000. Plaintiffs contend that the paperwork presented at closing was done in a rapid fashion with no one explaining its terms.

Plaintiffs later learned that both first and second mortgages were adjustable rate mortgages and contained pre-payment penalties that were not disclosed.  Moreover, the HUD Statement omitted key information, such as the $25,000 down payment that had already been paid to Palermo Construction, and the two loans plaintiffs received from Neuhaus.  Plaintiffs were also required to issue a certified check to Palermo Construction at the closing in the amount of $64,496.55, which was not listed on the HUD Statement.

Plaintiffs closed on the Maguire Ave. Property in May 2007.  Before plaintiffs left the closing, Shamah told them that she had additional paperwork for them to sign.  She then presented them with two "mortgages" in the amount of $145,000, and a Promissory Note in the amount of $120,000 between themselves and Neuhaus Realty.  These two mortgages were backdated to December 22, 2006, the same day that Neuhaus transferred $120,000 into Kong's bank account.  The mortgages were never disclosed on the HUD Statement at the closing of the Carlton Ave. Property or recorded, and Shamah never discussed the terms with plaintiffs.

4

## II.    Present Action

On March 26, 2010, plaintiffs commenced this action against all parties to the Carlton Ave. Property transaction: DeRogatis and Shamah ("Attorney Defendants"); Tristar and Rukab ("Mortgage Broker Defendants"); Neuhaus Realty, Neuhaus, and Ghorra ("Realty Defendants"); and Palermo Construction.

Essentially, plaintiffs argue that defendants perpetrated a scheme in which defendants worked together to falsify plaintiffs' credit worthiness in order to secure a mortgage. Thereafter, they provided plaintiffs with "advances" and "loans" to purchase the house, but failed to disclose these loans on the mortgage application or closing documents, enabling defendants to hide the true costs associated with this purchase. Plaintiffs contend that defendants failed to disclose their financial interest in this transaction or that they would be profiting in an amount above and beyond their normal fees. Meanwhile, plaintiffs claim the adjustable rates on their two mortgages have increased, they have been unable to refinance their home, and are making numerous monthly payments to Neuhaus in amounts ranging from $1,000 to $1,500 for the two advances.

Plaintiffs have asserted federal claims under the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679, against the Attorney, Mortgage Broker, and Realty Defendants, and under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, against the Mortgage Broker Defendants. They have also brought state law claims against the Attorney Defendants for malpractice; the Attorney, Mortgage Broker, and Realty Defendants for violations of New York General Business Law § 349; and against all the defendants for fraud / breach of fiduciary duty.[2]

---

[2] Plaintiffs also seek a declaratory judgment against the Realty Defendants rescinding both promissory notes and voiding the related mortgages. They have withdrawn their breach of contract claim against Palermo Construction.

5

The Attorney Defendants now move to dismiss plaintiffs' CROA and NYGBL § 349 claims.  Rukab moves to dismiss plaintiffs' CROA and RESPA claims, as well as all state law claims brought against him.  Palermo Construction moves to dismiss the sole state law claim against it.

## DISCUSSION

### I.   Standard of Review

"In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964 (2007); accord Ashcroft v. Iqbal, ---U.S. ----, 129 S. Ct. 1937, 1949-50 (2009)).  In other words, a complaint must contain factual allegations to support the legal conclusions and the factual allegations must "plausibly give rise to an entitlement to relief." Iqbal, 129 S. Ct. at 1950.

The Second Circuit has explained that under the Twombly standard, a Court's inquiry under Rule 12(b)(6) should be "guided by two working principles." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Iqbal, 129 S. Ct. at 1949) (internal quotation marks omitted).  "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (quoting Iqbal, 129 S. Ct. at 1949) (internal quotation marks omitted, alteration in original).  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss and [d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (quoting Iqbal, 129 S. Ct. at 1950) (internal quotation marks omitted, alteration in original).  Thus, "[w]hen there are well-

6

pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 129 S. Ct. at 1950.

Generally, leave to amend should be freely granted. See Fed. R. Civ. P. 15(a). Where, however, the problems with the claims for relief are "substantive" and would not be cured with "better pleading," repleading would be futile and any such request should be denied. Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000); see also Lucente v. IBM Corp., 310 F.3d 243, 258 (2d Cir. 2002) (noting that an amendment is futile if the proposed claim would not survive a motion to dismiss).

## II.    The Credit Repair Organization Act

Rukab and the Attorney Defendants have moved to dismiss plaintiffs' CROA claims on the basis that the Act only applies to credit repair organizations or persons associated with one, and that plaintiffs have failed to allege that defendants are either.[3] Plaintiffs concede that defendants are not credit repair organizations or associated with one, and acknowledge that certain provisions of the CROA only apply to credit repair organizations. However, they contend that the section defendants violated – § 1679b(a) – is broader in scope, providing that "no person" may engage in the prohibited conduct. See 15 U.S.C. § 1679b(a).

### A.  Statutory Interpretation of § 1679b(a)

In the absence of Second Circuit precedent on this issue, this Court must engage in a statutory analysis of the CROA to determine the meaning of the term "person" under 15 U.S.C. § 1679b(a). The path a Court must follow in interpreting a statute is clearly marked. First, I must look to the text of the statute to determine whether the meaning is ambiguous. See Robinson v.

---

[3] Rukab's primary argument for dismissal is that plaintiffs cannot recover under the CROA since they violated the Act themselves by making misrepresentations on their mortgage application. However, he argues in a footnote that he cannot be held liable under the CROA since the Act only applies to credit repair organizations.

7

Shell Oil Co., 519 U.S. 337, 340, 117 S. Ct. 843, 846 (1997); Marvel Characters, Inc. v. Simon,

310 F.3d 280, 290 (2d Cir. 2002).  This requires consideration of more than just "the language

[of the provision] itself ... [but also to] the specific context in which that language is used, and

the broader context of the statute as a whole."  Robinson, 519 U.S. at 341, 117 S. Ct. at 846.

"[I]f the statutory language is unambiguous and the statutory scheme is coherent and consistent,"

no further inquiry is required.  Id. at 340, 117 S. Ct. at 846 (internal citation and quotation marks

omitted).  However, if the language is ambiguous, this Court must "resort first to canons of

statutory construction and, if the meaning [still] remains ambiguous, to legislative history."

Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 423 (2d Cir. 2005).

        Plaintiffs allege that the Attorney, Mortgage Broker, and Realty Defendants violated

section 1679b(a)(1) of the CROA, which provides that "no person" may

> make any statement, or counsel or advise any consumer to make any statement,
> which is untrue or misleading (or which, upon the exercise of reasonable care,
> should be known by the credit repair organization, officer, employee, agent, or
> other person to be untrue or misleading) with respect to any consumer's credit
> worthiness, credit standing, or credit capacity to -- (A) any consumer reporting
> agency...; or (B) any person who has extended credit to the consumer; or to
> whom the consumer has applied or is applying for an extension of credit.

15 U.S.C. § 1679b(a)(1).  Plaintiffs focus on the words "no person" in the prohibited practices

section to argue that Congress specifically meant to make *all* persons – not only credit repair

organizations or individuals associated with them – subject to the prohibitions in §1679b(a).

        Everything about this statute – from its title, to its purpose, to its substantive provisions –

illustrates that it was enacted to specifically regulate the business practices of individuals and

organizations offering credit repair services.  In enacting the CROA, Congress codified its

findings as follows:

8

(1) Consumers have a vital interest in establishing and maintaining their credit worthiness and credit standing in order to obtain and use credit. As a result, consumers who have experienced credit problems may seek assistance from credit repair organizations which offer to improve the credit standing of such consumers.

(2) Certain advertising and business practices of some companies engaged in the business of credit repair services have worked a financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters.

15 U.S.C. § 1679(a). Based on these findings, Congress crafted the CROA to serve the dual purpose of ensuring "that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services," and "to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b). To that end, the statute contains specific provisions setting forth prohibited practices and required disclosures. See 15 U.S.C. §§ 1679b – 1679e.

There is no question that the required disclosures under the CROA pertain solely to credit repair organizations. See 15 U.S.C. § 1679c (setting forth the disclosures a credit repair organization is required to provide to a consumer before entering into a contract); 15 U.S.C. § 1679d (regulating the contents of credit repair organization contracts); 15 U.S.C. § 1679e (providing for a consumer's right to cancel a contract with a credit repair organization). Although it is less clear whether the prohibited practices section applies broadly or narrowly due

to the invocation of the term "person" rather than "credit repair organization,"[4] the definition

section of the CROA puts the term "person" in context.

Consistent with other consumer protection statutes, Congress crafted a definition of

"credit repair organization" that looks beyond how an individual or organization may classify its

business, and instead looks to the substance of what it actually does.  See Cortese v. Edge

Solutions, Inc., No. 04-cv-0956, 2007 WL 2782750, *4 (E.D.N.Y. Sept. 24, 2007) (noting that

"courts should construe consumer protection statutes 'liberally' in favor of consumers") (internal

citation omitted).  The term "credit repair organization" is defined under the Act as:

> *any person* who uses any instrumentality of interstate commerce or the mails to
> sell, provide, or perform (or represent that such person can or will sell, provide, or
> perform) any service, in return for the payment of money or other valuable
> consideration, for the express or implied purpose of-- (i) improving any
> consumer's credit record, credit history, or credit rating; or (ii) providing advice
> or assistance to any consumer with regard to any activity or service described in
> clause (i).

---

[4] Section 1679b(a) sets forth that "no person" may:

(1) make any statement, or counsel or advise any consumer to make any statement, which is untrue or
misleading (or which, upon the exercise of reasonable care, should be known by the credit repair
organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any
consumer's credit worthiness, credit standing, or credit capacity to--
(A) any consumer reporting agency (as defined in section 1681a(f) of this title); or
(B) any person who has extended credit to the consumer; or to whom the consumer has applied or is
applying for an extension of credit;

(2) make any statement, or counsel or advise any consumer to make any statement, the intended effect of
which is to alter the consumer's identification to prevent the display of the consumer's credit record, history,
or rating for the purpose of concealing adverse information that is accurate and not obsolete to--
(A) any consumer reporting agency;
(B) any person who has extended credit to the consumer; or to whom the consumer has applied or is
applying for an extension of credit;

(3) make or use any untrue or misleading representation of the services of the credit repair organization; or

(4) engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the
commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or
sale of the services of the credit repair organization.

15 U.S.C. § 1679b(a).

15 U.S.C. § 1679a(3)(A) (emphasis added).[5] Thus, this very broad definition subjects *any* person who is rendering these services to the prohibitions and requirements set forth in the statute, regardless of whether they call themselves a "credit repair organization." See, e.g., Iosello v. Lexington Law Firm, No. 03 C 987, 2003 WL 21920237, *6 (N.D. Ill. Aug. 7, 2003) (applying the CROA to lawyers); Wojcik v. Courtesy Auto Sales, Inc., No. 8:01cv506, 2002 WL 31663298, at *7-9 (D. Neb. Nov. 25, 2002) (determining that the CROA could apply to a car dealership); Parker v. 1-800 Bar None, No. 01 C 4488, 2002 WL 215530, at *3-5 (N.D. Ill. Feb. 12, 2002) (applying the CROA to a financial services company); Nielsen v. United Creditors Alliance Corp., No. 98 C 5910, 1999 WL 674740, at *2-3 (N.D. Ill. Aug. 23, 1999) (applying the CROA to a debt collector).

Despite plaintiffs' contentions, there is no inconsistency created by Congress's use of the term "persons" in § 1679b(a), instead of the term "credit repair organization." All "persons" who fall within the definition of a "credit repair organization" are in fact subject to the prohibitions set forth in § 1679b(a). Moreover, "[t]here is no question that Congress sought to provide broad protection to consumers in enacting the CROA." Hillis v. Equifax Consumer Services, Inc., 237 F.R.D. 491, 511 (N.D. Ga. 2006). The use of the term "persons" ensures that anyone who engages in the prohibited practices – in the context of providing credit repair services – would be subject to the CROA. In fact, the very provision at issue in this case – § 1679b(a)(1) – suggests that the individual engaging in these practices must have some connection to credit repair organizations because it prohibits "any statement ... which is untrue or misleading (*or which, upon the exercise of reasonable care, should be known by the credit*

---

[5] Section 1679a(3)(B) sets forth exceptions that are not applicable here.

*repair organization, officer, employee, agent, or other person to be untrue or misleading*)." 15
U.S.C. § 1679b(a)(1) (emphasis added).

      This Court also finds the cases plaintiffs cite in support of their position unpersuasive.
Plaintiffs rely principally on cases decided in the Northern District of Illinois and one in the
Western District of Pennsylvania. See, e.g., Whitley v. Taylor Bean & Whitacker Mortgage
Corp., 607 F. Supp. 2d 885, 899 (N.D. Ill. 2009); Martinez v. Freedom Mortgage Team, Inc., 527
F. Supp. 2d 827, 840 (N.D. Ill. 2007); Poskin v. TD Banknorth N.A., 687 F. Supp. 2d 530 (W.D.
Pa. 2009). The lead case in the Northern District of Illinois to adopt an expansive application of
§ 1679b(a) was Vance v. National Benefit Association, No. 99 C 2627, 1999 WL 731764, *1
(N.D. Ill. Aug. 30, 1999). The district court in Vance held that "no person" in § 1679b(a)
applied to everyone – regardless of their association with a credit repair organization – without
engaging in a statutory analysis or reading the provision in context with the rest of the statute.
Likewise, the court in Poskin, relying on Vance, found that just because "Congress use[d] both
the terms 'person' and 'credit repair organization' in § 1679b, [that indicated] that the terms are
not to be interchangeably read." Poskin, 687 F. Supp. 2d at 543.

      Obviously these cases are not binding on this Court, but more importantly, they fail to
read § 1679b(a) in context with the rest of the statute. The overwhelming majority of courts that
have done so, have held that § 1679b(a) only applies to credit repair organizations or individuals
associated with one. See, e.g., Henry v. Westchester Foreign Autos, Inc., 522 F. Supp. 2d 610,
614 (S.D.N.Y. 2007); Lopez v. ML #3, LLC, 607 F. Supp. 2d 1310, 1312 (N.D. Fla. 2009);
Bentley v. Alan Vester Auto Group, Inc., No. 5:07-cv-434-F, 2009 WL 3125539, *2 (E.D.N.C.
Sept. 29, 2009); Berry v. Cook Motor Cars, Ltd., Civil No. AMD 09-426, 2009 WL 1971391,*2
(D. Md. June 29, 2009); Moret v. Select Portfolio Servicing, Inc., No. 08-61996-CIV, 2009 WL

1288062, *3 (S.D. Fla. May 6, 2009); In re Wright, No. 05-40829-JJR-13, 2007 WL 1459475,

*11 (Bankr. N.D. Ala. May 16, 2007).

Furthermore, the position advocated for by plaintiffs not only ignores the context of the

statute, but would also yield an absurd result.  As aptly put by the Lopez court:

> The plaintiffs' broader reading would create a federal cause of action for any false
> statement in a credit application-with no requirement for an effect on commerce
> and no other federal jurisdictional peg.  This would be a remarkable and
> constitutionally-suspect expansion of federal regulation that undoubtedly would
> surprise the members of Congress who voted for the Act; they presumably
> believed the Act met the requirement for a jurisdictional peg because one was
> included in the definition of a "credit repair organization."  Moreover, this
> expansion of federal regulation would bear no relationship to the Act's explicitly
> stated purposes-to ensure the provision of adequate information to "prospective
> buyers of the services of credit repair organizations" and "to protect the public
> from unfair or deceptive advertising and business practices by credit repair
> organizations."  Properly construed, the Act will not bear this reading.

607 F. Supp. 2d at 1312-13 (internal citations omitted).

Concededly, the CROA does "include prohibitions that, if read out of context, could

apply to circumstances having no connection [whatsoever] to credit repair organizations or

services."  Id. at 1311 (discussing 15 U.S.C. § 1679b(a)(1)).  However, when this Court reads

these provisions – as it must – in the context of the statutes purpose to regulate credit repair

organizations, "it is clear that it was not Congress' intend [sic] to have [sic] CROA apply to all

persons, whether they are associated with credit repair or not."  Henry, 522 F. Supp. 2d at 613.

Accordingly, this Court holds that the term "persons" under § 1679b(a) does not apply to

"any" person, but rather only those persons that fall within the definition of a credit repair

organization or are associated with one.

### B. Plaintiffs Have Failed to State a Claim under the CROA

Here, plaintiffs have failed to state a claim against any of the defendants under the

CROA.  In their complaint, plaintiffs merely allege that defendants are "persons as the term is

used in 15 U.S.C. § 1679b(a)." Such a conclusory statement is insufficient to establish that defendants are a "credit repair organization" as defined under the CROA. Specifically, plaintiffs' pleading is devoid of any allegation that defendants were providing advice, assistance, or services, for the "express or implied purpose of improving [their] credit record, credit history, or credit rating." 15 U.S.C. §1679a(3)(A). Moreover, plaintiffs effectively concede in their complaint that defendants are not credit repair organizations or associated with one, but rather, were providing services in their respective capacities.

Although only the Attorney Defendants and Rukab have moved to dismiss, this Court *sua sponte* dismisses the CROA claims against Tristar and the Realty Defendants. A court may *sua sponte* consider dismissal if the issues are substantially the same as those concerning the other defendants, and if plaintiffs had notice and a full opportunity to be heard. See Aetna Cas. and Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 591 (2d Cir. 2005) (noting that a "district court may dismiss a complaint *sua sponte,* for failure to state a claim, as to non-moving defendants") (citing Wachtler v. County of Herkimer, 35 F.3d 77, 82 (2d Cir. 1994)).

The issue raised in this motion is the same with respect to all defendants – whether plaintiffs have alleged sufficient facts to establish that defendants violated § 1679b(a) of the CROA. As with the other defendants, plaintiffs merely allege in their complaint that the non-moving defendants "are persons as that term is used under 15 U.S.C. § 1679b(a)." Moreover, plaintiffs have had ample opportunity to brief this issue in their opposition to the motions to dismiss. Although Rukab primarily argued for dismissal on other grounds, the Attorney Defendants raised this exact issue and plaintiffs submitted a detailed response.

14

Accordingly, this Court grants the Attorney Defendants and Rukab's motion to dismiss plaintiffs' CROA claims, and *sua sponte* dismisses the CROA claims against Tristar and the Realty Defendants.

### C. *Amending the Complaint would be Futile*

This Court also finds that the deficiencies in plaintiffs' pleadings are substantive and cannot be cured by "better pleading." See Cuoco, 222 F.3d at 112. Even assuming that defendants made the misrepresentations plaintiffs claim, there is no indication that they were offering services for the "express or implied purpose of improving [plaintiffs'] credit record, credit history, or credit rating." Defendants were providing services in their respective roles as attorneys, brokers, and realtors to a real estate transaction. If they made misrepresentations as to plaintiffs' "credit worthiness, credit standing, or credit capacity" to a consumer reporting agency or other entity, it was for the purpose of securing a home mortgage for plaintiffs to purchase a house – not to repair their credit – and the remedy for such a misrepresentation is not by bringing a CROA claim.

### III.   The Real Estate Settlement Procedures Act

Plaintiffs allege that the Mortgage Broker Defendants violated RESPA's prohibitions against kickbacks and unearned fees by (1) receiving a yield spread premium ("YSP") from the mortgage lender for increasing plaintiffs' interest rate and/or for steering or referring business to

15

the lender; and (2) splitting fees with the other defendants in exchange for steering business to the Mortgage Broker Defendants.  See 12 U.S.C. § 2607a and b.[6]

Defendant Rukab has moved to dismiss plaintiffs' RESPA claim on the basis that it is time-barred.  Although Tristar has not moved to dismiss, plaintiffs have asserted the same claim against both defendants, thus if their claim is time-barred as to Rukab, it is time-barred as to Tristar.

### A. Plaintiffs' RESPA claim is time-barred

The statute of limitations for claims brought under section 2607 of RESPA is one year from the date of the occurrence of the violation.  12 U.S.C. § 2614.  In closed-end transactions, such as mortgage loans, the cause of action accrues "no later than the date the plaintiff enters the loan agreement."  Cardiello v. The Money Store, Inc., No. 00 Civ. 7332 (NRB), 2001 WL 604007, at *3 (S.D.N.Y. June 1, 2001) (collecting cases).  Here, plaintiffs' claim accrued at the latest in May of 2007 when they closed on the Carlton Ave. Property.  Thus, plaintiffs' claim is clearly time-barred as they commenced this action almost three years later.

Nonetheless, plaintiffs argue that the statute of limitations should be equitably tolled due to defendants' fraudulent concealment of these referral and fee-splitting agreements.[7]  Plaintiffs

---

[6] Section 2607 of RESPA provides in relevant part:

(a) No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

(b) No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

12 U.S.C. § 2607a and b.

[7] Plaintiffs asserted in their complaint that their RESPA claim should also be tolled by the discovery rule, but abandoned this position in their motion papers.

16

contend that the statute of limitations should be told until March of 2010, when they retained counsel in this litigation and first became aware of the existence of their RESPA claim.

### B. Equitable Tolling is Not Warranted

Under the equitable tolling doctrine, the statute does not begin to run until the plaintiff actually has or should have by exercise of reasonable diligence become aware of his legal claim. Cerbone v. Int'l Ladies' Garment Workers' Union, 768 F.2d 45, 48 (2d Cir. 1985) (citing City of Detroit v. Grinnell Corp., 495 F.2d 448, 461 (2d Cir. 1974)).  Equitable tolling is available only in "rare and exceptional circumstances, where [the court finds] that 'extraordinary circumstances' prevented a party from timely performing a required act, and that the party 'acted with reasonable diligence throughout the period he [sought] to toll.'"  Walker v. Jastremski, 430 F.3d 560, 563 (2d Cir. 2005) (quoting Doe v. Menefee, 391 F.3d 147, 159 (2d Cir. 2004) (alteration in original)).  The Second Circuit has held that equitable tolling is appropriate "[w]here [the] defendant is responsible for concealing the existence of plaintiff's cause of action." Veltri v. Bldg. Serv. 32b-J Pension Fund, 393 F.3d 318, 323 (2d Cir. 2004).

In order to establish fraudulent concealment, plaintiffs must "allege that the defendant committed either: (1) a 'self-concealing act'-an act committed during the course of the breach that has the effect of concealing the breach from the plaintiff; or (2) 'active concealment'-an act distinct from and subsequent to the breach intended to conceal it." Caputo v. Pfizer, Inc., 267 F.3d 181, 189 (2d Cir. 2001).  Plaintiffs have the burden of demonstrating the appropriateness of equitable tolling and "must plead each of these elements with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure." Nat'l Group for Commc'ns and Computers Ltd. v. Lucent Techs. Inc., 420 F. Supp. 2d 253, 265 (S.D.N.Y. 2006); see Boos v. Runyon, 201 F.3d 178, 185 (2d Cir. 2000). "Conclusory allegations of fraudulent concealment are not sufficient to

17

withstand a motion to dismiss." <u>Moll v. U.S. Life Title Ins. Co. of New York</u>, 700 F. Supp. 1284, 1289 (S.D.N.Y. 1988).

Although the Second Circuit has not determined whether equitable tolling applies to RESPA claims, many district courts within this Circuit have found equitable tolling to be warranted given the Second Circuit's strong policy favoring equitable tolling absent an express directive not to do so by Congress. <u>See</u> <u>Atlantic City Elec. Co. v. Gen. Elec. Co.</u>, 312 F.2d 236, 241 (2d Cir. 1962)); <u>see also</u> <u>Williams v. Aries Financial, LLC</u>, No. 09-cv-1816, 2009 WL 3851675, *1 (E.D.N.Y. Nov. 18, 2009); <u>Moll</u>, 700 F. Supp. at 1287-88; <u>McKay v. Sacks</u>, No. 05cv2307, 2005 WL 1206810 at *12 (E.D.N.Y. May 20, 2005). This position is also consistent with the majority of courts in other Circuits who have decided this issue. <u>See</u> <u>Lawyers Title Ins. Corp. v. Dearborn Title Corp.</u>, 118 F.3d 1157, 1166-67 (7th Cir. 1997) (RESPA subject to equitable tolling); <u>Carr v. Home Tech Co., Inc.</u>, 476 F. Supp. 2d 859, 868-69 (W.D. Tenn. 2007) (same); <u>Mullinax v. Radian Guar., Inc.</u>, 199 F. Supp. 2d 311, 328 (M.D.N.C. 2002) (same); <u>Pedraza v. United Guar. Corp.</u>, 114 F. Supp. 2d 1347, 1353 (S.D. Ga. 2000) (same); <u>Kerby v. Mortgage Funding Corp.</u>, 992 F. Supp. 787, 797 (D. Md. 1998) (same); <u>but see</u> <u>Hardin v. City Title & Escrow Co.</u>, 797 F.2d 1037, 1040-41 (D.C. Cir. 1986) (statute of limitations imposed by RESPA is a jurisdictional prerequisite and not subject to equitable tolling); <u>Zaremski v. Keystone Title Assoc., Inc.</u>, No. 88-2569, 1989 WL 100656, *2 (4th Cir. Aug. 30, 1989) (per curiam) (same).

Regardless of whether a RESPA claim is subject to equitable tolling, the Court finds that this case does not warrant it. Plaintiffs claim that defendants took "affirmative steps" to conceal the referral and fee-splitting arrangements by (1) failing to disclose and/or discuss them, and (2) not including this information in any of the loan documents. Even if defendants never discussed

18

these arrangements with plaintiffs, "[c]oncealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry." Moll, 700 F. Supp. at 1291 (quoting Wood v. Carpenter, 101 U.S. 135, 143 (1879)). For example, plaintiffs do not allege that defendants lied to them or made any misrepresentations concerning the fees they would receive or any arrangements they made with other parties to the transaction. Instead, they make conclusory allegations that defendants "deprived [them] of vital information necessary to discover that RESPA had been violated," without identifying what that "vital" information is or how it was affirmatively concealed. See, e.g., Williams, 2009 WL 3851675, at *9 (finding plaintiffs allegation that defendants did not inform her of the true purpose of the subordinate mortgage and other fees to be insufficient to equitably toll her RESPA claim for fraudulent concealment).

Nevertheless, even assuming that defendants alleged omission of the kickbacks from the loan documents constituted fraudulent concealment, plaintiffs have still failed to allege that despite exercising due diligence, they could not have discovered the cause of action within the statutory period. Plaintiffs have not pled any facts to indicate that they exercised diligence in discovering their claim. To the contrary, plaintiffs appear to have done nothing since closing on the Carlton Ave. Property. They failed to embark on even the most basic step of asking defendants about the loan documents, mortgage terms, or their fees.

Plaintiffs argue that they "have never worked in the mortgage loan industry and did not know anyone who could have reviewed their loan documents and made them aware of the meaning of the YSP and the likely existence of [the] referral and fee-splitting arrangements." However, they are in essence conceding that the YSP was denoted in their loan documents – they just failed to notice it or understand its import. This is, therefore, not a case where the plaintiffs

19

were "prevented in some extraordinary way from exercising [their] rights," for example, where they "could show that it would have been impossible for a reasonably prudent person to learn" about their cause of action. Miller v. Int'l Telephone & Telegraph Corp., 755 F.2d 20, 24 (2d Cir. 1985).

Accordingly, this Court finds that the facts alleged by plaintiffs do not warrant the invocation of equitable tolling and thus, plaintiffs' RESPA claim is dismissed as time barred. Since plaintiffs' RESPA claim against Tristar is the same as that against Rukab, and plaintiffs have had a sufficient opportunity to brief this issue, the Court *sua sponte* dismisses the RESPA claim against Tristar. See Aetna, 404 F.3d at 591.

### C. Amending the Complaint would be Futile

Plaintiffs request in their opposition papers for leave to amend their pleading to include specific facts supporting their RESPA claims. However, this Court finds that the deficiencies in plaintiffs' pleadings cannot be cured by "better pleading." See Cuoco, 222 F.3d at 112. The undisputed facts indicate that plaintiffs made no effort during the almost three years since closing on their house to learn of their potential RESPA claims. Therefore, plaintiffs are unable to satisfy the due diligence requirement in order to equitably toll the statute. See Nelson v. Stahl, 173 F. Supp. 2d 153, 166 (S.D.N.Y. 2001) (recognizing that a motion to dismiss on the basis of plaintiffs' failure to engage in due diligence can be granted where the "undisputed facts" show a lack of reasonable diligence); Coveal v. Consumer Home Mortg., Inc., 04-4755, 2005 WL 704835, at *10 (E.D.N.Y. March 29, 2005) (dismissing for plaintiffs' failure to make a showing of due diligence).

## IV.   State Law Claims

Having dismissed all the federal claims, plaintiffs only remaining claims are state law claims for fraud, breach of fiduciary duty, legal malpractice, and violations of NYGBL § 349. Since plaintiffs' federal claims have been dismissed at such an early stage in this litigation, this Court declines to exercise supplemental jurisdiction over their state law claims. Brzak v. United Nations, 597 F.3d 107, 113-14 (2d Cir. 2010); see also Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S. Ct. 614 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims"). Accordingly, plaintiffs' state law claims are dismissed without prejudice. See Chanayil v. Gulati, 169 F.3d 168, 171-72 (2d Cir. 1999).

## CONCLUSION

This Court grants defendants' motion to dismiss as to plaintiffs' CROA and RESPA claims. Plaintiffs' state law claims are dismissed without prejudice. The Clerk of the Court is directed to enter judgment in favor of defendants.

**SO ORDERED.**

U.S.D.J.

Dated: Brooklyn, New York
       September 13, 2010

21